## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **Mumin Slaughter** : | |
| : | |
| **Plaintiff,** : | |
| : | |
| **v.** : | **Jury Trial Demanded** |
| : | |
| **City of Philadelphia, Philadelphia District** : | |
| **Attorney's Office, George Pirrone,** : | |
| **Richard Harris, John Doe as the Personal** : | |
| **Representative of the Estate of Thomas** : | |
| **Augustine, Michael Walters, Marvin King,** : | |
| **Richard Bova, John McDermott, and Aaron** : | |
| **Booker** : | |
| : | |
| **Defendants.** : | |
| : | |

### COMPLAINT

Plaintiff Mumin Slaughter, by and through his attorneys, Wiseman Schwartz Cioschi & Trama, LLP, states as follows:

### I.  Introduction

1.      Beginning in 2005, when he was just 24 years old, and continuing for almost 19 years thereafter, Mumin Slaughter was wrongfully imprisoned for a crime he did not commit and had nothing to do with. Despite his innocence of the murder of Philadelphia police officer Terrence Flomo, Mr. Slaughter was arrested, convicted, and imprisoned for almost two decades due to the unconstitutional misconduct of Philadelphia Police Department (PPD) detectives and the Philadelphia District Attorney's Office (DAO).

2.      When Flomo was shot at 2:00 a.m. on August 26, 2005, near the intersection of 20th Street and Cecil B. Moore Avenue in North Philadelphia, Mr. Slaughter was asleep at home

1

in Mt. Airy. At the time, Mr. Slaughter had two young sons who he actively cared for, was attending GED and job readiness classes five days a week, and was living with his sister and her husband in their Mt. Airy home. On August 26, 2005, he woke up and commuted to school around 7:00 a.m. No physical or forensic evidence ever connected Mr. Slaughter to Flomo's shooting.

3.     Facing intense pressure to close the investigation into their fellow officer's murder, the defendant PPD detectives coerced two vulnerable individuals—Brenda Bowens and Nora Williams, both sex workers struggling with drug addiction—to falsely implicate Slaughter and his co-defendant William Johnson, who had grown up in the area where Flomo was shot, as his killers.

4.     The defendant detectives' tactics included threatening, bribing, and intimidating Bowens and Williams and pressuring them to implicate Slaughter and Johnson according to a false narrative the defendant detectives fed to the two women, who made clear to the defendant detectives that they did not know who shot Flomo.

5.     The defendant detectives then hid their use of these improper tactics and the witnesses' contradictory statements (like that they did not know who shot Flomo) from the prosecution and the defense.

6.     These illicit tactics—using coercive means to secure false inculpatory statements and concealing related exculpatory and impeachment information (including the use of those tactics and contradictory statements from the witnesses)—represented the practice and custom in the Homicide Division of the PPD in the years leading up to Mr. Slaughter's wrongful conviction. Detectives routinely deployed these tactics to close homicide cases with their chosen suspects.

7.    The DAO buried additional critical exculpatory and impeachment evidence in Mr. Slaughter's case (including letters Bowens sent to the prosecution declaring her statement was false and fed to her by defendant detectives who forced her to endorse it, and records of Williams's ongoing, severe psychiatric symptoms) that demonstrated the total unreliability of Bowens and Williams's statements. This powerful, favorable evidence was concealed pursuant to a custom and practice within the DAO at the time to suppress exculpatory and impeachment evidence, including when the prosecutor claimed a subjective belief that it lacked credibility.

8.    At trial in 2007, the jury acquitted Mr. Slaughter and Mr. Johnson of first-degree murder, convicted Slaughter of third-degree murder, and failed to reach a unanimous verdict for Johnson on the charge of third-degree murder. Slaughter was sentenced to 25–50 years in prison. At Johnson's retrial, he was convicted of third-degree murder and sentenced to prison for 30–60 years.

9.    In 2020, Brenda Bowens, who had recovered from her drug addiction and became a health-care worker in Philadelphia, recanted her trial testimony. Based on that recantation, Johnson filed a PCRA petition and gained access to the DAO trial file, which contained critical, previously concealed exculpatory and impeachment evidence fully undermining the prosecution's case.

10.    The suppressed evidence included letters sent by Brenda Bowens to District Attorney Lynne Abraham and the trial prosecutor, Carlos Vega, in March 2006, *before the first trial*, in which Bowens explained she was forced to give her false statement implicating Slaughter and Johnson by the defendant detectives, who had told her what to say.

11.    District Attorney Abraham did not disclose the letter she received to the defense, as she considered it, in her words, to be "bullshit." Instead, she simply forwarded the letter to the

3

DAO homicide unit where it was delivered to the trial prosecutor Carlos Vega. Pursuant to the policy, custom, and practice of the DAO to withhold and suppress *Brady* evidence, Mr. Vega deliberately concealed this letter from the defense, as well as a similar letter Ms. Bowens sent directly to him. Further, Vega suppressed other critical exculpatory and impeaching evidence regarding Bowens and Ms. Williams.

12.     Based on this newly discovered evidence, in 2023, Mr. Johnson and the prosecution jointly moved for Johnson to be granted habeas relief, with the prosecution stipulating that its misrepresentations "raised a significant risk of injustice." *Johnson v. Lamas*, Order on Joint Motion for Relief, No. 2:12-cv-05156, Doc. 36 (E.D. Pa. Mar. 13, 2023) (cleaned up). Upon careful review of the parties' submissions on this issue, the District Court, Brody J., agreed habeas relief was due and ordered Johnson's conviction vacated. The DAO's subsequent motion to dismiss all charges against Mr. Johnson in the Court of Common Pleas was granted on June 8, 2023.

13.     On December 1, 2023 and February 23, 2024, respectively, Mr. Slaughter filed a federal habeas petition and a petition for relief under Pennsylvania's Post-Conviction Relief Act based on the *Brady* violations and official misconduct of Vega, Abraham, and the police officers involved in the case that had been uncovered and led to his co-defendant Mr. Johnson's exoneration.

14.     On May 9, 2024, the District Attorney's Office conceded its violations of Mr. Slaughter's constitutional rights required Mr. Slaughter receive a new trial.

15.     On June 17, 2024, the Philadelphia County Court of Common Pleas, DiClaudio J., granted Mr. Slaughter's PCRA petition and the prosecution's motion to dismiss all charges

against him. After almost two decades, Mr. Slaughter was finally released from prison that same day.

16.     Mr. Slaughter's wrongful conviction was the direct result of the PPD defendant detectives' coercion of witnesses, fabrication of evidence, and malicious prosecution, and the policy, practice, and custom of the former DAO of intentionally and/or recklessly suppressing exculpatory and impeachment information in violation of the U.S. Constitution.

17.     As reflected in multiple cases of exonerations of persons convicted of murders they did not commit, these actions were the product of the City's longstanding practice, policy, and custom of failing to train, supervise, and discipline detectives in the PPD Homicide Division to comply with constitutional obligations; the City's acquiescence to improper police practices and customs; and the unconstitutional policies, practices, and customs of former District Attorneys.

## II.    Jurisdiction and Venue

18.     This Court has jurisdiction over the subject matter of this Complaint under 42 U.S.C. § 1983 and 28 U.S.C. §§ 1331, 1343(a)(3), 1343(a)(4), and 1367(a).

19.     Venue is proper in this Court as the incidents at issue in this matter occurred within the Eastern District of Pennsylvania.

## III.    Parties

20.     Plaintiff Mumin Slaughter is a resident of Philadelphia, Pennsylvania.

21.     Defendant City of Philadelphia is a municipality in the Commonwealth of Pennsylvania and owns, operates, manages, directs, and controls the Philadelphia Police Department which, at all relevant times, employed the individual defendants.

22.     Defendant Philadelphia District Attorney's Office is the prosecuting agency of the City and County of Philadelphia.

23.     Individual defendants George Pirrone, Richard Harris, John McDermott, Michael Walters, Marvin King, Richard Bova, and Aaron Booker (collectively "defendant detectives"), former and current detectives in the Philadelphia Police Department, are sued in their individual capacities.

24.     Defendant John Doe is sued in his capacity as the personal representative of the estate of Thomas Augustine, who is a deceased former detective in the Philadelphia Police Department. An estate for Augustine is in the process of being raised and, once a personal representative is appointed, Mr. Slaughter will amend this pleading to properly name that personal representative.

25.     At all times relevant to this Complaint, the defendants acted in concert and conspiracy and were jointly and severally responsible for the harms caused to Mr. Slaughter.

26.     At all times relevant to this Complaint, all defendants acted under color of state law.

## IV.    Facts

### A. Under pressure to solve the high-profile murder of Philadelphia police officer Terrence Flomo, the defendant detectives build a false case against Mr. Slaughter and Mr. Johnson.

27.     Philadelphia police officer Terrence Flomo was shot and killed at 2:00 a.m. on August 26, 2005, while sitting in his car, off duty, near 20th Street and Cecil B. Moore Avenue in North Philadelphia. The area was a hotbed for sex workers and drug trafficking.

28.     The Philadelphia Police Department ("PPD") Homicide Division assigned responsibility for the investigation of Flomo's murder to defendant detective Augustine, who was aided in the investigation by defendant detectives Pirrone, Harris, McDermott, Walters, King, Bova, and Booker.

29.     Throughout the investigation, the defendant detectives regularly communicated amongst themselves, both orally and in writing, about their investigative activity, including with regard to the decision to target Mr. Slaughter and Mr. Johnson in the absence of any real evidence suggesting them as plausible suspects. The defendant detectives jointly agreed to fabricate evidence implicating Mr. Slaughter and Mr. Johnson and provided updates to one another about the false evidence they created.

30.     To the extent any individual defendant detective did not directly participate in a specific portion of the investigation, all of them learned of the below-described investigative conduct based on their regular communications with each other through the course of the investigation. As such, all defendant detectives knew of or recklessly disregarded each other defendant detective's unlawful actions and inactions throughout the prosecution of Mr. Slaughter, yet they failed to act to prevent those actions and/or inactions from causing harm to Mr. Slaughter.

31.     The day of the murder, the defendant detectives interrogated Brenda Bowens and Nora Williams, who were working as sex workers in the area of the shooting. During these initial interrogations at the Homicide Division, both women truthfully denied seeing the shooting or anything related to the shooting.

32.     Defendant detectives proceeded to obtain photographs of Black men who had open bench warrants and/or open cases and who could be detained and questioned about the murder, regardless of whether they had information that implicated them or others. Two of these men were Mumin Slaughter and William Johnson.

33.    Facing pressure to close this high-profile case, the defendant detectives, acting in concert and conspiracy, honed in on Johnson and Slaughter, both of whom had ties to the neighborhood, and worked together to build a false case against them.

34.    In the days following Flomo's killing, the defendant detectives detained Mr. Slaughter when he was visiting friends in the neighborhood. They held Mr. Slaughter at the Homicide Division for many hours and interrogated him multiple times. Mr. Slaughter repeatedly truthfully told them he was not present at the time of the shooting and had no information about the shooting. Unable to get Mr. Slaughter to falsely inculpate himself, the defendant detectives turned to others in the neighborhood.

35.    The defendant detectives went to the home of neighborhood figure Tony Bennett multiple times in the week following the shooting. Each time Bennett told them to stop and told them truthfully that he hadn't seen the shooting.

36.    On August 30, 2005, defendant sergeant Marvin King transported Bennett to the Homicide Division where he and defendant detective Michael Walters interrogated Bennett. Bennett again truthfully told Walters and King he did not know who the shooter was. Walters and King told Bennett that Slaughter was responsible and pressured Bennett to provide information implicating Slaughter. Walters and King prepared a written statement falsely attributing statements to Bennett, including that Slaughter had a gun on his person the night of Flomo's killing and that Slaughter always had a gun on him, and pressured Bennett to sign it. Bennett gave in to their pressure and intimidation and signed the false statement.

37.    The defendant detectives went back to Brenda Bowens within days of first interrogating her and brought her back to the Homicide Division for further interrogation. They detained her for hours, knowing she was a drug addict. Bowens again truthfully told them she did

not know anything about the shooting. The defendant detectives told her Slaughter and Johnson shot Flomo and pressured her to provide a statement to that effect. The defendant detectives threatened to arrest Bowens on her open bench warrant and threatened she could "wind up in concrete." Bowens resisted their threats and pressure that day and refused to provide a false statement inculpating Slaughter and Johnson.

38.     On September 5, 2005, Debra Bryant contacted the police. Defendant detectives Augustine and Bova took Bryant's statement. Bryant described observing two men named Peanut and Jeff shoot Flomo while he sat in his car. Her description included details that matched the physical evidence and other details (like the time and location) of the crime. Her description also included detailed biographical and physical descriptions of the assailants, Peanut and Jeff. These descriptions did not match Slaughter and Johnson.

39.     Despite this critical break in their investigation that could possibly have led them to the true perpetrators of Flomo's shooting, the defendant detectives agreed to continue pursuing their chosen suspects, Slaughter and Johnson, and to not conduct any meaningful investigation based on the lead from Bryant.

40.     On September 8, 2005, defendant detectives again interrogated Bowens. Defendant Detective Augustine transported Bowens to the Homicide Division, where he, along with defendant Detectives Pirrone and Harris, interrogated Bowens for hours. Bowens again told them she did not know who shot Flomo. The defendant detectives told Bowens she could not leave until she provided a statement naming Johnson and Slaughter as Flomo's shooters. They also told her she would be arrested and incarcerated on a probation violation unless she gave them the statement they wanted. They told her the specific story she was to repeat back about Flomo's shooting, including that Bowens argued with Flomo before he was shot and that

Slaughter and Johnson then approached Flomo's car and shot him inside. Eventually Bowens gave in to the pressure, threats, and intimidation, and provided the false statement the defendant detectives fed to her, identifying Slaughter and Johnson as Flomo's shooters.

41.    The defendant detectives also interrogated Nora Williams multiple additional times in the weeks following their initial contact with her. On September 8, defendants Harris and Pirrone interrogated Williams at the Homicide Division. They told Williams that Slaughter and Johnson shot Flomo and pressured her to provide a statement to that effect. Williams again truthfully told them she did not know who was responsible. The defendant detectives, aware that Williams was addicted to drugs, held her for hours, and told her she could leave after providing a statement implicating Slaughter and Johnson as Flomo's shooters. They also offered Williams assistance with her open criminal charges in exchange for a statement implicating Slaughter and Johnson as additional incentive. The defendant detectives told Williams the specific story she was to repeat back about Flomo's shooting that matched the details they had fed to Bowens (including that Bowens argued with Flomo before he was shot and that Slaughter and Johnson then approached Flomo's car and shot him inside). Eventually, Williams gave in and provided the false statement they were asking for.

42.    All defendant detectives knew that Bowens and Williams's statements were false and the product of police coercion. They either heard directly from Bowens and Williams and/or discussed amongst themselves that Bowens and Williams both insisted they did not see the shooting or know who was responsible. And they discussed amongst themselves and agreed upon the coercive tactics they engaged in to obtain Bowens and Williams's false statements implicating Slaughter and Johnson (including detaining them for hours of interrogation (knowing they were addicted to drugs); using intimidation and threats and pressuring Bowens and Williams

to provide statements implicating Slaughter and Johnson according to an agreed-upon fact pattern that was fed to the two women; telling them they could only leave if they provided these false, fed statements; and using their open criminal charges to induce their cooperation).

43.     As the defendant detectives all knew, both women were vulnerable to police pressure as they were addicted to cocaine and engaging in sex work to support their addiction. Further, Bowens was under probation supervision, and Williams had open criminal charges.

44.     Detectives Augustine and Pirrone have been credibly accused of multiple incidents of misconduct during homicide investigations, including allegations that they have coerced vulnerable witnesses and suspects into giving false statements.[1]

45.     On September 10, defendant Detectives McDermott and Walters interrogated Williams again and, using the same pressure and intimidation tactics Harris and Pirrone had used with her two days prior, had her reaffirm the false statement she had made, knowing that it was untrue.

46.     The defendant detectives conspired to use improper threats and coercion to secure false statements against Johnson and Slaughter.

47.     The arrest warrant and the prosecution of Mr. Slaughter were based on these false and coerced statements.

_____

[1] *See* The Homicide Files, THE PHILADELPHIA INQUIRER, May 7, 2021, available at https://www.inquirer.com/crime/inq2/philadelphia-murder-homicide-cases-database-20210507.html (last visited December 5, 2025) (reporting Augustine's involvement in securing coerced statements in at least five cases including the murder convictions of Anthony Wright and Walter Ogrod, both of whom have been exonerated). Detective Pirrone has had similar accusations against him in at least five cases, including cases where Pirrone created false evidence. *Id*; *see also Goodwin v. City of Phila.,* et al., No. 2:23-cv-04708 (E.D. Pa.) (wrongful homicide conviction lawsuit asserting similar constitutional violations against Pirrone, along with co-conspirators Detectives James Pitts, Thomas Gaul, and John Verrecchio, which yielded a substantial, pre-discovery settlement).

48.    The defendant detectives concealed their coercive tactics with Bennett, Bowens, and Williams—including the use of threats, pressure, intimidation, offering to help with open criminal charges, and feeding specific false narratives they pressured them to repeat back—from the prosecution and the defense. The defendant detectives also concealed these individuals' contrary statements, which fully undermined the false statements attributed to them, from the prosecution and the defense. Instead of telling the prosecution the truth, the defendant detectives falsely reported to the prosecution that Bennett, Bowens, and Williams provided their false, fed statements implicating Slaughter and Johnson voluntarily, without any improper influence, and from their own personal knowledge.

**B. The prosecution suppresses critical favorable evidence, consistent with DAO custom and practice to suppress exculpatory and impeachment evidence, including where the prosecutor claimed a subjective belief it was false.**

49.    In 2006, before the first trial, Bowens sent letters to District Attorney Lynne Abraham and the trial prosecutor, Carlos Vega, stating that her statement was not true and that she had been coerced by the police. She explained that she was "forced by Detective Richard [Harris] and Detective Thomas Augustine to give [her] statement . . . they told me what to say!" Bowens further requested that the DAO "open an investigation into the Homicide Unit," and she made clear that she did not want to testify because she had been "threatened and forced into the statement."

50.    District Attorney Abraham received the letter, but she did not disclose it to Mr. Slaughter, nor did she direct the prosecutor in the case, Carlos Vega, to disclose this *Brady* material.  In response to an inquiry from the current DAO regarding the motion to dismiss the criminal charges against Johnson, Abraham confirmed that she would have reviewed the letter, but that she did not disclose it because prosecutor Vega considered it to be "bullshit" and

therefore there was no duty to disclose. The trial prosecutor, Carlos Vega, deliberately suppressed the letters as well pursuant to long-standing practices and customs of the DAO of willfully suppressing evidence favorable to the accused, including when prosecutors claimed they did not believe the facially exculpatory or impeaching evidence was reliable or would lead to an acquittal of the accused.

51.    These critical documents remained secret and suppressed over the many years of post-conviction review. Throughout that time, assistant district attorneys assigned to the DAO's appellate and federal habeas units had access to the files and deliberately failed to disclose the evidence to Johnson or Slaughter, consistent with and pursuant to DAO practices and customs.

52.    Vega and others within the DAO suppressed other critical *Brady* evidence, including the report from a preliminary hearing court-ordered competency evaluation of Nora Williams. The evaluation found that Williams suffered from a "Psychotic Disorder –NOS [not otherwise specified], as well as auditory hallucinations." Williams reported that she had been hospitalized for psychiatric issues at least seven times, including in June 2005, two months before the shooting of Officer Flomo.

53.    According to the report, Williams had been placed on medication and remained in psychiatric care for two weeks during the June 2005 hospitalization. Upon leaving psychiatric care, she ceased taking her medication, and she continued to experience hallucinations at the time of the shooting and during the investigative phase of this case.

54.    Vega and others within the DAO also suppressed evidence regarding financial incentives provided to Bowens and Williams, including a promise of cash and dental assistance in exchange for Bowens's testimony and Williams's relocation due to her financial difficulties.

55.     Vega and others within the DAO suppressed all of this information consistent with and pursuant to the DAO practices and customs described in this complaint.

**C. Slaughter is wrongfully convicted and sentenced to decades in prison at a 2007 trial based on the false evidence the defendant detectives fabricated and without the benefit of critical exculpatory and impeachment evidence suppressed by the defendant detectives and the DAO; Johnson is wrongfully convicted at a second trial.**

56.     In 2007, Slaughter was tried with his co-defendant, Johnson. No physical evidence connected them to the crime. Bowens and Williams were the only supposed eyewitnesses to identify Slaughter and Johnson as the shooters. While both were subject to some level of impeachment, Slaughter's counsel was without the critical suppressed evidence that would have entirely undermined their credibility.

57.     Following her pretrial recantation, Bowens was subjected to additional coercion and threats from the defendant detectives and trial prosecutor Vega, directing her to testify in a manner consistent with the statements detectives had coerced her to sign during the initial investigation of the case.

58.     As a direct result of the continued coercion and threatening conduct, Bowens testified that she was working as a sex worker on the night of the offense, had finished with a client, and was walking to a house where she intended to get high, when Flomo called to her from his car. She rejected his solicitation and told Johnson and Slaughter that Flomo had tried to pick her up. Bowens claimed that soon afterwards she saw the two men at Flomo's car and then heard gunshots.

59.     Williams testified that she was also working as a sex worker and was engaged with a client at the time of the shooting. Williams claimed that she observed Bowens get into Flomo's car, argue with him, and then get out of his car and walk up the street. She claimed she then saw Johnson and Slaughter approach the car and begin firing.

14

60.     Both Bowens and Williams's testimony was false and was the direct result of the defendant detectives' use of threats, pressure, and coercion to fabricate a prosecution against Slaughter and Johnson.

61.     Johnson presented the testimony of Debra Bryant. Bryant endorsed her signature and biographical information on a statement given to the police in which she stated that she had observed the shooting, could see the perpetrators, and that two other people, Peanut and Jeff— not Slaughter and Johnson, who she testified she had never seen before—were responsible.

62.     The jury deliberated for nearly three days. Slaughter and Johnson were both acquitted of first-degree murder. Slaughter was convicted of third-degree murder. The jury did not reach a verdict as to Johnson on third-degree murder.

63.     Through his trial and conviction, Slaughter maintained his innocence.

64.     In preparation for Johnson's retrial, trial prosecutor Vega put intense pressure on Slaughter to implicate Johnson in exchange for a lighter sentence. Initially, Slaughter refused, truthfully telling Vega he was innocent, was not present at the time of the shooting, and had no information about the shooting. But, under immense pressure from Vega to implicate Johnson, and having been wrongfully convicted of murdering a police officer, facing decades of wrongful incarceration away from his young children for a crime he did not commit, and having lost all faith that the system would bring the truth to light, Slaughter, out of desperation, endorsed a false statement identifying Johnson as the shooter, in exchange for the promise of leniency on his sentence.

65.     On September 5, 2008, defendant Detectives McDermott and Booker met with Slaughter without counsel and took a statement from Slaughter falsely implicating Johnson as the shooter. As McDermott and Booker knew, the substance of this statement was not true and

was not based on Slaughter's personal knowledge, but was instead based on careful instructions from McDermott, Booker, and Vega about the specific false information that should be included.

66.     Just as the defendant detectives had fed Bowens and Williams a specific false narrative designed to match what one another said, in this process, defendant detectives McDermott and Booker shaped Slaughter's statement so that it fit the false statements previously coerced from Bowens and Williams. Detective McDermott, on behalf of himself and Detective Booker, even signed a correction to the statement that changed Slaughter's assertion that Johnson was standing on the driver's side of Flomo's car to the passenger side, consistent with the false statements from Bowens and Williams

67.     Slaughter soon came to deeply regret endorsing the false statement, and fought to correct the record, including by informing the judge at Johnson's retrial, on the record, that the statement was completely false and only provided out of Slaughter's desperation to lessen his sentence for a crime he did not commit, to have some hope of returning to his children sooner. Slaughter refused to testify against Johnson at his retrial, even as the prosecution sought to increase his sentence by more than a decade as punishment for this refusal. Slaughter went as far as pleading with the judge to give him extra years rather than force him to testify in support of the lies in his statement.

68.     Slaughter has maintained his innocence since this event.

69.     Slaughter was sentenced to 25–50 years in prison on his 2007 conviction.

70.     Johnson was convicted of third-degree murder at his 2009 retrial, at which Slaughter's false statement implicating him was introduced through a detective, and sentenced to 30–60 years in prison.

**D. Slaughter and Johnson are finally exonerated after almost two decades of wrongful imprisonment.**

71.     In 2020, after recovering from her drug addiction and gaining training and employment in the healthcare field, Brenda Bowens fully recanted her trial testimony. In that recantation, she asserted, *as she had stated in her pre-trial letters to Abraham and Vega*, that she was threatened and pressured by the defendant detectives into providing evidence against Johnson and Slaughter.

72.     Based on that recantation, Mr. Johnson filed a PCRA petition seeking to vacate the conviction. In discovery in those proceedings, the prosecution produced the DAO's prosecution files, and counsel found the above-described *Brady* material that had been deliberately suppressed for 18 years.

73.     In 2023, Johnson obtained habeas relief and the DAO subsequently moved to dismiss all charges against him.

74.     On December 1, 2023 and February 23, 2024, respectively, Mr. Slaughter filed a federal habeas petition and a petition for relief under Pennsylvania's Post-Conviction Relief Act based on the *Brady* violations and official misconduct of Vega, Abraham, and the police officers involved in the case that had been uncovered and led to his co-defendant Mr. Johnson's exoneration.

75.     On May 9, 2024, the District Attorney's Office conceded its violations of Mr. Slaughter's constitutional rights required Mr. Slaughter receive a new trial.

76.     On June 17, 2024, the Philadelphia County Court of Common Pleas, DiClaudio J., granted Mr. Slaughter's PCRA petition and the prosecution's motion to dismiss all charges against him. Mr. Slaughter was released the same day.

**E. Slaughter's wrongful conviction was a product of the PPD's unconstitutional policies, practices, and customs.**

77.    The unconstitutional conduct of the defendant detectives was directly and proximately caused by long-established practices and customs in the PPD and specifically in the PPD Homicide Division.

78.    Dating back to the 1970s, and continuing beyond the time of the investigation of this case, there is documented evidence of the City of Philadelphia's policy, practice, and custom of unconstitutional misconduct in homicide investigations, and in particular, the concealing and withholding of exculpatory and impeachment evidence, coercive techniques in interviews and interrogations to obtain incriminating evidence, fabrication of evidence, tampering with or manufacturing evidence, and conducting improper identification procedures.

79.    This policy, practice, or custom involved the use of various techniques in interviews and interrogations to coerce false inculpatory statements and to make those false statements appear true and reliable, including, but not limited to: falsely threatening criminal charges, including probation violations, for which there was no probable cause; threatening prolonged or indefinite detention; providing interviewees and suspects information about the crime; feeding interviewees information and/or specific false narratives and using threats, pressure, and bribes to get them to repeat it/them back; and telling interviewees and suspects they could not leave until providing the statement officers wanted from them.

80.    This policy, practice, or custom also involved the concealment of information from the prosecution and the defense that would reveal the falsity of witness and suspects statements, and the misrepresentation to the prosecution of the circumstances of interviews and interrogations. This included but was not limited to, selectively documenting a witness or suspect's eventual statement but not the preceding interrogation and improper tactics used or the

witness or suspect's prior contradictory statements, and misrepresenting that a suspect or witness's formal statement was given voluntarily, from their own knowledge (without being told what to say), and without any pressure, bribery, threats, or any other improper influence.

81.     These practices were well known to the City of Philadelphia and its policymakers by reason of newspaper investigations, including Pulitzer Prize reporting in the Philadelphia Inquirer in 1977, governmental investigations, verified complaints from lawyers and civilians, and internal police investigations.

82.     The facts of a significant number of cases demonstrate that this misconduct was pervasive within the PPD at the time of this case.  The cases include the following:

a) **Willie Stokes:** In 1984, PPD detectives arrested Franklin Lee on rape and related charges. After his arrest, homicide detectives interviewed him about a 1980 murder and falsely told him that a witness had identified him as the person who committed that murder. Detectives insisted that Lee knew that Stokes was the murderer and that if he did not cooperate with their investigation, they would "hang" him. Lee succumbed to the pressure and agreed to sign a false statement implicating Stokes in the murder. For years, Lee continued to have contact with the investigating detectives who maintained control over him by allowing access to drugs and sexual encounters while incarcerated. Stokes remained wrongfully imprisoned for 39 years until December 2021 when a federal district court vacated his conviction based on the investigating detectives' pervasive misconduct.

b) **Curtis Crosland:** In 1987, PPD officers interviewed an informant with a long history of violent crimes who was seeking assistance from law enforcement to reduce his sentence for a parole violation. The informant told officers that Curtis Crosland had at

some undetermined time in 1986, confessed that he committed a 1984 robbery and murder at a neighborhood grocery store in South Philadelphia. Investigating detectives knew that the informant's statement was false; the informant had provided inconsistent information to police, had failed a polygraph, and had told other family members that another person—that is, not Curtis Crosland—had admitted to the crime. Despite this knowledge, detectives persisted in bringing charges against Crosland and then suppressed all information in their possession showing the falsity of the informant's testimony. Further, detectives suppressed and concealed information pointing to an alternative suspect—information that was highly credible as the suspect matched the size and description of the perpetrator given by eyewitnesses to the shooting. Finally, as Crosland's 1989 trial approached, detectives pressured and coerced a vulnerable witness who suffered from mental health disorders and had attempted suicide to provide testimony asserting that Crosland had expressed fear about the fact that an award offered to the community for information about the shooting would lead to an arrest. Crosland was convicted as a result of these unlawful police tactics and remained incarcerated for 34 years until an investigation by the DAO's Conviction Integrity Unit (CIU) located the referenced exculpatory information in police files. In 2021, a federal district court accepted the CIU's concession that Crosland was entitled to relief and was likely innocent, and, therefore, vacated the conviction.

c) **Pedro Alicea**: In 1989, after failing for four years to resolve a 1985 double homicide of Hector and Luis Camacho, PPD detectives fabricated a case against Pedro Alicea and in doing so disregarded significant evidence demonstrating that two local drug dealers were responsible. They coerced vulnerable individuals to provide false identifications

20

of Alicea; pressured Angel Fuentes, a longtime informant who had a close personal relationship with the lead detective, and who was facing significant prison time on a number of open charges, to endorse a fabricated statement identifying Alicea as the shooter; coerced Ray Velez, who had himself been implicated in the murders, to falsely identify Alicea as the shooter (by detaining him and threatening to charge him with the murders if he did not submit). The detectives also suppressed exculpatory evidence, including a reliable eyewitness statement, pointing to the true perpetrators. Alicea was convicted and was wrongfully imprisoned for more than 31 years before the exonerating evidence was discovered by the CIU, resulting in the vacatur of his conviction and release in 2020.

d) **Carlos Hernandez and Ed Williams**: PPD Homicide Division detectives coerced a false statement from a witness to a robbery and murder by detaining the witness without food or water for days. That statement led to the 1991 arrests of Hernandez and Williams, but it was later proven that Williams had been in a secure-treatment facility at the time of the crime.

e) **Jackie Combs Jr**.: PPD Homicide Division detectives coerced four young witnesses into falsely claiming that Combs committed a murder in 1990. Each witness later provided consistent accounts of the physical and verbal abuse that caused them to give false statements.

f) **Percy St. George**: In 1993, a PPD Homicide detective coerced two persons to give false statements implicating St. George in a murder. When the detective was asked to testify about the allegations of coercion and fabrication, he asserted his Fifth Amendment privilege against self incrimination and declined to answer questions.

Despite that assertion, the detective was permitted to remain active in PPD Homicide Division investigations for several years.

g) **Donald Ray Adams:** PPD Homicide Division detectives coerced a witness to implicate Adams in a 1990 murder by threatening the witness and by offering to provide her financial support for her testimony.  Detectives ignored the fact that Adams's physical description was vastly different from the description provided by witnesses at the scene.  Adams's conviction was later vacated, and he was acquitted at a retrial.  His subsequent civil suit resulted in a financial settlement.

h) **Andrew Swainson:** In 1988, PPD Homicide Division detectives based their arrest of Swainson on the testimony of a single witness who had been taken into custody while running from the scene of the murder in blood-soaked clothes.  The witness identified Swainson in a photo array after he was threatened with arrest and told to select Swainson's photograph from an array.  Based on this evidence, among other instances of misconduct, in June 2020, Swainson's conviction was vacated, and all charges were dismissed.

i) **James Dennis**: PPD Homicide Division detectives investigating a murder in 1991 coerced witnesses to identify Dennis while at the same time they intentionally concealed information which provided Dennis with an incontrovertible alibi.  The detectives' conduct led to the Third Circuit's *en banc* decision concluding that the concealment of evidence violated Dennis's due process rights.  *See Dennis v. Sec'y, Pa. Dep't of Corr.*, 834 F.3d 263, 307 (3d Cir. 2016).

j) **Shaurn Thomas**: PPD Homicide Division detectives arrested Thomas in 1993 on charges that he was involved a 1990 murder.  Thomas had a documented alibi that he

was present in juvenile court at the time the murder occurred, but based on testimony from another man who was involved in the murder, he was convicted.  In May 2019, the DAO agreed to dismiss the charges after discovering, among other things, previously undisclosed information in police files showing that officers had questioned a suspect just following the crime who provided police non-public facts about the murder and failed a polygraph test.  Thomas's civil rights suit resulted in a settlement of more than $4 million.

k) **Anthony Wright**:  Wright was convicted of the 1991 rape and murder of an elderly woman based on Homicide Division detectives' fabrication of a confession and planting of evidence.  DNA testing later confirmed Wright's innocence, and he was acquitted at a retrial.  His subsequent civil rights action resulted in a settlement of nearly $10 million.

l) **Walter Ogrod:** In 1992, PPD detectives coerced and fabricated a false confession from Ogrod, a trucker with a low-average IQ, to the 1988 murder of a four-year-old girl. Ogrod had driven all night and had not been to bed in 36 hours when the lead detective interrogated him. Detectives interrogated Ogrod for hours, then fabricated a statement in Q-and-A form that they falsely claimed was a verbatim record of a voluntary statement.  At his first trial, 11 of 12 jurors voted to acquit before a mistrial was declared. At a retrial three years later, with the aid of a notorious jailhouse snitch, the state convicted Ogrod of capital murder. Ogrod has since been exonerated, the charges dismissed, and he was released from prison after serving more than 25 years. Ogrod's civil suit resulted in a settlement of $9.1 million.

m) **Willie Veasy:** Veasy was convicted of murder based on a 1992 confession secured by PPD Homicide Division Detectives' use of physical force. At the time of the murder, Veasy was working in a restaurant miles from the scene of the crime. Veasy's conviction was vacated in 2019 upon the motion of the DAO, and his subsequent civil rights suit resulted in a multi-million-dollar settlement.

n) **Steven Lazar:** Lazar was convicted of a 2007 murder as a result of PPD Homicide Division Detectives, including defendants Booker and McDermott, fabricating witness statements and securing a false confession by knowingly subjecting Lazar to more than 30 hours of interrogation while he was undergoing severe opioid withdrawal. Lazar's conviction was vacated in March 2023 based on the discovery of suppressed evidence after he had spent approximately 16 years in prison.

o) **Bruce Murray:** In 1983, Murray was convicted of a 1980 murder based on PPD Homicide Division Detectives knowingly presenting fabricated trial testimony, coercing false witness statements, and suppressing exculpatory evidence. Murray was exonerated in April 2023 based on the DAO's acknowledgement that numerous pieces of favorable evidence were suppressed during the original trial.

p) **Gerald Howell:** In late 1982 into the early months of 1983, Philadelphia Police Detectives coerced witnesses into inculpating Howell in a murder that was committed by Kenneth Parnell. PPD Detectives told Arlene Williams, a teenager at the time, that they would arrest Parnell, the father of her child, for the murder if she did not sign a statement inculpating Howell. PPD Detectives also threatened two other teenage witnesses with arrest if they did not come to court to testify against Howell, even though the police had reason to believe that Parnell was the real shooter. Additionally,

PPD Detectives suppressed information given to them by the brother of the decedent that Parnell was the shooter. Years later, Parnell confessed to the murder for which Howell had been convicted. In 2022, the DAO conceded that the PPD had suppressed exculpatory evidence. In 2023, a federal judge granted Howell's habeas corpus petition and vacated his conviction. Howell was released in 2023 after being imprisoned for four decades for a crime he did not commit.

q) **Richard Carpenter**: In 2007, prosecutors admitted they made a mistake when they sought a murder conviction against Kevin Felder. The case against Felder was based on four inculpatory witness statements, though all four witnesses recanted their statements and testified that the statements were the results of threats and intimidation by homicide detectives. One of those witnesses was Richard Carpenter. In 2006, Detective Thomas Gaul physically abused Carpenter, threatened his family, and coerced him to falsely implicate Felder. Without objection from the City of Philadelphia, Carpenter obtained an injunction against Defendant Gaul, prohibiting Defendant Gaul from contacting him without his written consent or his counsel's presence. The City settled Carpenter's suit for $30,000.

r) **David Sparks**: When Gary Hall was shot to death in 2006, David Sparks called 911, pleading for help: "Somebody got shot. He's possibly dying. Please could you hurry up. Please." Sparks, however, was wrongfully prosecuted for Hall's killing, convicted of first-degree murder, and sentenced to life without parole. The evidence against Sparks at trial included the purported police statement of Barry McShore, in which he purportedly identified Sparks as the killer to Lieutenant Aisha Perry. But at trial, McShore denied witnessing the shooting or identifying Sparks to Perry; instead, he told

the jury he was forced to sign a false statement that homicide detectives, including Perry, crafted. Sparks was ultimately exonerated after fifteen years of incarceration when it was revealed that Detective Donald Marano, the assigned investigator, concealed evidence supporting Sparks' defense that Ivan Simmons was the killer, including a signed and adopted eyewitness interview identifying Simmons as the culprit, and ballistics evidence tying the weapon used to kill Hall to a killing Simmons had committed four days before Hall's shooting death.

b) **Hakeem Moore**: In the days following the robbery-murder of Jonathan James, Detectives Kevin Judge, Nathaniel Williams,[1] and Gregory Singleton[2] developed compelling evidence suggesting that one of the eyewitnesses to James' killing, Saheida Winfrey, had in fact set James up to be robbed. Soon thereafter, local narcotics officers received a tip that Justin Mershon was James' killer, which reinforced the setup theory, and the detectives briefly investigated Mershon. After Winfrey and her friend Rondera Joe identified Hakeem Moore as the culprit, this theory was abandoned, along with the

---

[1] On November 21, 2019, Williams was fired from the Philadelphia Police Department and charged with various crimes—including tampering with public records and information, multiple counts of unsworn falsification to authorities, and obstructing governmental administration—for having lied to the Internal Affairs Division during an internal investigation and for fabricating evidence in connection with that investigation. *See Com. v. Williams*, MC-51-CR-0030428-2019; Robert Moran, *2 Philly Cops Charged in Separate Cases*, THE PHILADELPHIA INQUIRER (Nov. 21, 2019), available at https://www.inquirer.com/news/nathaniel-williams-charles-myers-philadelphia-police-misconduct-20191121.html. The erroneous dismissal of those charges was reversed by the Pennsylvania Supreme Court, and Williams now faces trial on those charges. *See Com. v. Williams*, 331 A.3d 556 (Pa. 2025).

[2] The DAO has developed substantial evidence that Detective Singleton has engaged in misconduct. Most disturbingly, the Commonwealth has plainly proven that Detective Singleton intentionally deleted text message communications with Defendant Nordo, and has asserted that, in testifying before an investigating grand jury concerning that deletion, Singleton was less-than-forthright. *See, e.g., Second Motion to Disqualify Defense Counsel*, *Com. v. Sharif Cooper*, CP-51-CR-00002213-2019, ¶¶ 34–65.

investigation into Winfrey's seeming co-conspirator, Mershon. The detectives not only abandoned the lead, but they concealed it from the prosecution. The reason for that abandonment and concealment was not simply Moore's identification, but the status of Mershon as a critical police asset in the investigation of another drug-related murder— that of Jimmy Jamal Moody—that occurred just blocks away from James' killing. Indeed, just three months before James' killing, Mershon was granted immunity for testifying against Moody's accused killer, Ridley Shields, and provided critical evidence against Shields at Shields' preliminary hearing. Prior to Hakeem Moore's trial for James' killing, Mershon would again provide critical, immunized testimony at Shields' trial, where Mershon implicated himself in the conspiracy to kill Moody, in a conspiracy to kill Moody's associate, in the unlawful acquisition and possession of firearms, and as a crack dealer whose turf made it likely he was one of Jonathan James' competitors. These powerful exculpatory facts were revealed through postconviction discovery and litigation and led to the grant of a new trial

s) **Braheim Parker**: In the early morning hours of August 5, 2008, Chauncy Miller was shot and killed in North Philadelphia. Fifteen-year-old Anthony Hyman witnessed the killing and was transported to the Roundhouse, where Detectives Joseph McDermott, John Cahill, and Levi Morton interrogated him alone, not permitting him to have a parent present. They told Hyman that they knew Parker was the shooter, even going so far as to suggest that Parker's grandmother said he killed Miller. They repeatedly showed Hyman the same individual picture of Parker, insisting he was the shooter, and told him to circle Parker's photo in a photo array. Hyman repeatedly—and truthfully— told them Parker was not the shooter, and that the shooter was a light-skinned male, not

dark-skinned like Parker. Rather than taking these truthful statements seriously, the detectives told Hyman that other witnesses were saying Hyman was the shooter, suggesting that if he did not implicate Parker, they might try to pin the murder on him. At the same time, they made clear that if he identified Parker, he could go home. So coerced, Hyman adopted the detectives' story and falsely identified Parker as Miller's shooter. That false, coerced identification—which Hyman disavowed at Parker's preliminary hearing and trial—was the foundation of the case against Parker. But owing to the detectives' suppression of their suggestive and coercive tactics, the full truth concerning their unlawful treatment of Hyman was concealed until Hyman came forward in 2023. In December 2025, this Court granted Parker habeas corpus relief.

t)    **Dwayne Thorpe**: On July 4, 2008, Hamin Span was shot and killed by a teenager in Kensington, while Thorpe, then 25 years old, was at a block party in a different Philadelphia neighborhood miles away. But Detective James Pitts,[1] Detective Timothy Scally, and others would soon pin Span's murder on Thorpe with the aid of unconstitutional investigative tactics. Defendant Pitts and Detective Scally first coerced Senetra Stones to falsely implicate Thorpe in Span's killing, by deploying tactics including threatening to take her children away and threatening criminal prosecution for alleged contraband found in her apartment during an illegal search. Pitts then turned

---

[1] Defendant Pitts was fired from the PPD and was convicted following a jury trial in the Philadelphia County Court of Common Pleas on two counts of perjury and three counts of obstructing the administrative of law or other governmental function (18 Pa.C.S. § 5101) for violently interrogating Obina Onyiah to secure Onyiah's false confession to a robbery and homicide and subsequently lying about that interrogation at Onyiah's pretrial motions hearing and jury trial. *See generally Com. v. James Pitts*, CP-51-CR-0004729-2022 (Phila. Ct. Com. Pl.). Pitts was sentenced to 32-to-64 months' incarceration on February 7, 2025.

to Allen Chamberlain, against whom he deployed physical violence, threats of a murder prosecution, and threats to take Chamberlain's children away to coerce him to falsely implicate Thorpe in Span's killing. Finally, Defendant Pitts and Detective Scally unlawfully induced Nyfeese Robinson, Span's 15-year-old brother, to falsely identify Thorpe as Span's killer. Pitts, Scally, and their cohort concealed their tactics from the prosecution and the defense, as well as the jury that convicted Thorpe based on Chamberlain's false implication of Thorpe to the police and Robinson's improper in-court identification. In November 2017, the Philadelphia Court of Common Pleas granted Thorpe a new trial, concluding that Pitts used "habitually coercive conduct towards witnesses in custodial interrogations" based on the testimony of numerous witnesses who had suffered such abuse at Pitts' hands.[1] After concluding that Robinson's identification was the product of suggestion and Chamberlain's purported statement to Pitts was unreliable, the prosecution dismissed all charges against Thorpe in March 2019, liberating him after nearly 11 years of wrongful incarceration

83. As evidenced by the pervasive nature of the conduct in these cases, detectives in the PPD Homicide Division had free reign to engage in unconstitutional actions with the knowledge and acquiescence of City policymakers and PPD Homicide Division supervisors and command staff, all of whom were deliberately indifferent to this misconduct.

84. At the same time, detectives and officers in the Homicide Unit and other assignments had engaged in systemic constitutional violations of suspects in criminal investigations, pursuant to practices and customs of violating the Fourth and Fifth Amendments.

---

[1] This abuse occurred with the encouragement, knowledge, or at least conscious disregard of his fellow PPD Homicide Unit detectives and supervisors, like Defendants Clark and Wilkins.

As a result, courts in this district enjoined the Police Department and the City to prevent and otherwise remedy these constitutional violations. *See*, *e.g.*, *Cliett v. City of Philadelphia*, No. 85cv-1846 (E.D. Pa. 1985) (consent decree arising out of "Operation Cold Turkey," which resulted in the unlawful arrest and detention of 1,500 individuals through drug enforcement practices); *Spring Garden Neighbors v. City of Philadelphia*, 614 F. Supp. 1350 (E.D. Pa. 1985) (enjoining police sweeps of Latinos in the Spring Garden area in a homicide investigation); *Arrington v. City of Philadelphia*, No. 88-cv-2264 (E.D. Pa. 1988) (enjoining stops, detentions, and searches of African-American men during investigation of the "Center City Stalker").

85.     Thereafter, in the late 1980s and early 1990s, a narcotics squad operating out of the 39th Police District engaged in widespread unconstitutional practices, including fabrication of evidence, unlawful search and arrest warrants, concealment of evidence, false allegations of criminality, fabricating and planting evidence, coercive and physically abusive interrogations, and theft. This squad engaged in these practices for years and violated the rights of thousands of persons, due to the deliberate indifference of the City of Philadelphia, including the disregard of credible complaints to the PPD Internal Affairs Division and the District Attorney, biased internal investigations, and a practice and custom of exonerating officers regardless of evidence of misconduct.

86.     These systemic and unconstitutional practices and customs had been ignored, with deliberate indifference by the City of Philadelphia, and were addressed only upon investigation by the FBI and prosecution of the officers by the United States Attorney's Office.

87.     After a full investigation by these outside agencies, and the filing of a class action lawsuit, a court entered a Consent Decree requiring wide ranging reforms in the PPD, and in

particular the cessation of improper PPD investigative practices and policies. *See NAACP v. City of Philadelphia*, No. 96-cv-6045.

88.    In sum, at the time of the investigation and prosecution of Mr. Slaughter, the City of Philadelphia and its policymakers were deliberately indifferent to PPD's policy, practice, and custom of:

a.    Concealing and/or failing to disclose exculpatory and impeachment evidence, engaging in unlawful interrogation of suspects, using coercion and threats during interrogations, fabricating and planting evidence, fabricating witness and suspect statements, and using improper identification procedures;

b.    Using these practices to target people of color for unlawful treatment;

c.    Failing to take appropriate disciplinary or other corrective actions with respect to police officers who engaged in illegal or unconstitutional conduct and/or PPD Directives;

d.    Failing to properly train and supervise officers with respect to the constitutional limitations on their investigative, detention, search, and arrest powers;

e.    Ignoring systemic patterns of police misconduct and abuse of civilians in police investigations and prosecutions, including unlawful police interrogations, searches, and arrests, coercion of witnesses, improper identification procedures, falsifying and fabricating evidence, and suppressing exculpatory evidence; and

f.    Failing to properly sanction or discipline PPD officers who were aware of and concealed and/or aided and abetted violations of constitutional rights of

individuals by other PPD officers, thereby causing and encouraging

Philadelphia police, including the defendant officers in this case, to violate the

rights of persons such as Mr. Slaughter.

89.    The City of Philadelphia has been deliberately indifferent to the constitutional

duty to train, supervise, and discipline police officers.  Specifically, the Internal Affairs Division

(IAD) of the PPD and PPD Commissioners have failed to impose meaningful disciplinary and

remedial actions in investigations marked by the following deliberately indifferent practices:

    a.  Excessive and chronic delays in resolving disciplinary complaints;

    b.  A lack of consistent, rational, and meaningful disciplinary and remedial

       actions;

    c.  A failure to effectively discipline substantial numbers of officers who were

       found to have engaged in misconduct;

    d.  A failure to establish a credible and fair internal investigatory process;

    e.  Imposing incident-based, rather than progressive discipline, resulting in the

       failure to penalize repeat violators;

    f.  Failure to institute necessary training and supervision for IAD investigators in

       order to ensure proper investigations;

    g.  Failing to institute quality control measures to ensure valid IAD findings and

       conclusions;

    h.  Failing to adopt an effective early warning system to identify, track, and

       monitor officers with significant disciplinary infractions;

    i.  Failing to interview available eyewitnesses to incidents involving citizen

       complaints of misconduct; and

       j.   Failing to acknowledge the disproportionate and extreme use of violence and other improper conduct used by police officers.

90.    The City of Philadelphia, through its deliberate indifference, was a moving force in the violation of Mr. Slaughter's constitutional rights.

**F.  Slaughter's wrongful conviction was also a product of the DAO's unconstitutional policies, practices and customs.**

91.    Defendant DAO caused the wrongful conviction of Mr. Slaughter by reason of a pervasive practice and custom of failing to disclose *Brady* exculpatory and impeachment evidence, and by the actions of then District Attorney Lynne Abraham who, as the final policymaker in the DAO, failed to disclose exculpatory and impeaching evidence to Mr. Slaughter.  The actions of Abraham, as the final policymaker, are attributable to the DAO.

92.    As alleged above, the DAO file in this case contained numerous documents that constituted *Brady* exculpatory and impeachment evidence which the District Attorney and the trial prosecutor, Carlos Vega, deliberately suppressed, and which were then suppressed for 18 years by other assistant district attorneys who represented the prosecution in direct appeal and federal habeas proceedings.

93.    Included in this array of *Brady* material were letters sent to Abraham and Vega by Brenda Bowens, the main prosecution witness, whose statements and testimony were the product of threats and coercion by the defendant detectives. Abraham and Vega deliberately suppressed this evidence, thus preventing the defense from proving that the testimony of Bowens and Williams was the direct result of coercion and threats.

94.    Abraham received and read the letter addressed to her and, without an investigation or inquiry about the case or circumstances of the threats and coercion described in the letter, she did not disclose the letter to counsel for Mr. Slaughter. Instead, she forwarded it to

the DAO Homicide Unit where, pursuant to practice and custom in the DAO, Vega suppressed this and other *Brady* evidence. Abraham acknowledged that she would have reviewed the letter, but did not disclose it because Vega considered it to be "bullshit."

95.    For decades dating back to the 1970s, the DAO as a matter of practice, policy, and custom, failed to properly train, discipline, and supervise prosecuting attorneys with respect to their duty to disclose *Brady* material.  The DAO throughout the time of Mr. Slaughter's direct appeal and unsuccessful habeas litigation did not train, discipline, or otherwise sanction assistant district attorneys for withholding *Brady* material.  To the contrary, assistant district attorneys in the appeals and post-conviction units were instructed not to review files for any possible *Brady* violations and that even upon viewing such documents there was no duty to disclose them to the defendant.

96.    The practice and custom of the DAO before and during Mr. Slaughter's and Mr. Johnson's direct appeals and unsuccessful habeas litigation of failing to abide by *Brady* disclosure requirements is evidenced by exonerations of criminal defendants subjected to that practice and custom, and by other post-conviction adjudications based on prosecutors' deliberate withholding of *Brady* material.  These cases include:

  a.  **Commonwealth v. Robert Devine:** In 2023, the Court of Common Pleas granted a new trial to Devine following disclosure of Brady evidence that had been suppressed by the DAO from time of his trials in 2003 through to PCRA proceedings where, as in the Slaughter case, defense counsel found the exculpatory and impeaching evidence in the DAO file. In Devine's case, the DAO had stated in discovery proceedings that it had no information of sexual assaults committed in the same type of unique circumstances (sexual assault

by tree branch) as the assaults with which Devine was charged. However, the
DAO file contained a formal Memo from the PPD that listed other such sexual
assaults during the relevant time period.

b. **Commonwealth v. Alen Lee**: Lee was falsely convicted of murder for which
he served 15 years in custody before his full exoneration in 2004 in
postconviction proceedings in which the DAO conceded Lee's right to a new
trial and dismissal of all charges. Detectives William Shelton and Leon
Lubiejewski and Assistant District Attorney Arlene Fisk conspired to suppress
exculpatory evidence, and in particular information from New York City and
Washington D.C. law enforcement officers that another person, and not Lee,
was responsible for the murder. That person had confessed to being involved
in the murder and had named another perpetrator, and not Lee, as a
coconspirator. Further, there was evidence that the detectives engaged in
suggestive identification procedures and that the person who was involved had
fled the jurisdiction. Lee's civil action following his exoneration resulted in a
settlement with a significant payment of damages.

c. **Commonwealth v. Christopher Williams:** Williams was prosecuted for a
1989 triple homicide and another 1989 homicide. His PCRA petitions were
granted, and his convictions vacated following disclosure of *Brady* evidence
that had been suppressed by the DAO from the time of Williams's 1992 and
1993 trials through to 2019, when the DAO disclosed the DAO and police
files to defense counsel. In both cases, the DAO called David Lee as a witness
without disclosing the full details of his prior involvement in two other
homicide cases nor his role as a federal informant, and thereafter repeatedly

made false statements in court filings about the nature of Lee's prior

involvement in other homicide cases. In both cases, the DAO also called

James White without disclosing that the DAO promised to help secure White's

early release in exchange for his guilty plea to these and two other homicides.

In the triple homicide, the DAO suppressed statements from witnesses that

contradicted White's testimony, as well as evidence of an extensive police

investigation into an alternative suspect. Williams's triple homicide conviction

was vacated in 2019, and his other conviction was vacated two years later. A

civil rights action following Williams's exoneration resulted in a settlement

and a payment of substantial damages.

d.  **Commonwealth v. Walter Ogrod:**  As described above, Ogrod was

prosecuted for murder of a four-year-old child on a theory of intentional

assault and convicted at a second trial in 1996. In post-conviction

proceedings, the Commonwealth, represented by Defendant DAO, conceded

his entitlement to relief on the grounds of the deliberate suppression and

nondisclosure of *Brady* material by the homicide unit and the DAO, as well as

DAO *Napue* violations, that showed that (1) the child died of asphyxia and not

head wounds as charged at trial, (2) the investigating detectives coerced a

false and unreliable confession and (3) jailhouse informants who testified

against Mr. Ogrod were entirely unreliable and were provided benefits not

disclosed to the defense. With respect to the claims alleging suppression of

*Brady* material by the DAO, the Answer expressly acknowledged that "[f]or

decades and with some frequency, it appears that the Philadelphia District

Attorney's Office failed to comply with its obligations in regard to *Brady* and

its progeny." Based on the allegations, the DAO concession, and the record in the case, Ogrod was granted a new trial and all charges were dismissed.

e. **Commonwealth v. James Green:** The DAO prosecuted an eighteen-year-old James Green for capital murder for the December 1996 shooting death of Ronald "Natural Born" Spearman. Green claimed that he drew his gun and shot in self-defense only after Spearman hunted him down and fired at him. The prosecution was predicated on the testimony of Robert Willis, who claimed, contrary to Green, that Green was the first aggressor—that is, that Green shot first. At the behest of ADA Kenneth McDaniels during his testimony at Green's trial, Willis admitted he himself had an open second-degree murder charge, but repeatedly and unequivocally asserted that the DAO promised him no consideration in exchange for his cooperation against Green. In 2021, during PCRA proceedings in the Pennsylvania Superior Court, the DAO disclosed a memorandum authored by ADA McDaniels located in the DAO's trial file for Willis' murder case. That memo expressly stated that the DAO made a deal with Willis, whereby Willis agreed to cooperate against Green and Green's co-defendant, Twain Bryant, in exchange for which the DAO would allow Willis to plead guilty to third-degree murder, receive a sentence of probation, and receive pretrial release. Based on this discovery, the DAO requested the Superior Court remand the case, and the Superior Court promptly obliged. The DAO conceded that *Brady* was violated and Green was entitled to a new trial—a concession ultimately accepted by the Court of Common Pleas. Eager to resolve his case and secure his freedom from pretrial detention, Green entered a negotiated guilty plea with the DAO

for time served, freeing him from incarceration after more than twenty-four
years.

f.  **Commonwealth v. Wayne T. Smith:** In July 2010, Wayne Smith was
arrested for the murder of David Dial and the attempted murder of Tyrell
Harris, based, in significant part, on the eyewitness statement provided by
Jamial Burley.  In September 2012, Smith's first trial, prosecuted by ADA
Andrew Notaristefano, ended in a hung jury.  In the weeks and days leading
up to Smith's 2015 retrial, Burley: attempted suicide by (an unlawfully
possessed, stolen) gun; was arrested after falsely reporting that suicide attempt
as a gunpoint robbery and prosecuted for illegal gun possession and making
false reports under MC-51-CR-0000452-2015 (and later CP-51-CR-0004096-
2015); was psychiatrically committed at the Hospital of the University of
Pennsylvania (HUP) for days; attempted suicide again at HUP in the presence
of police and HUP staff; was court-ordered to be assessed for his competency
to stand trial; was diagnosed with bipolar disorder; and was again
psychiatrically committed, this time at the Philadelphia Prison System, for
sixty days, encompassing the date he would offer testimony against Smith.
ADA Notaristefano and his co-counsel, ADA Lorraine Donnelly, deliberately
concealed Burley's serious mental health troubles and treatment and the true
nature of Burley's criminal case from Smith, the jury, and the trial court,
helping to procure Smith's convictions for third-degree murder and
aggravated assault.  In 2024, following direct appeal, PCRA, and federal
habeas proceedings, the DAO disclosed Burley's criminal case files for CP-
51-CR-0004096-2015 and MC-51-CR-0000452-2015 and Smith's prosecution

files to Smith, which revealed the prosecutors' deliberate concealment of this powerful impeachment evidence. In May 2025, the Court of Common Pleas granted PCRA relief to Smith based on this *Brady* violation and accepted a negotiated plea that will make Smith parole eligible in July 2026, as opposed to July 2037.

**G. The defendants' violations of Mr. Slaughter's constitutional rights caused extraordinary harms and losses.**

97.    Mr. Slaughter's unlawful arrest, prosecution, conviction, and incarceration were caused by the conduct of the individual defendants, the City of Philadelphia, and the DAO.

98.    The individual defendants knowingly, intentionally, and recklessly fabricated evidence, concealed and suppressed exculpatory information, and maliciously prosecuted Slaughter pursuant to policies, practices, and customs of defendant City of Philadelphia, including the failure, with deliberate indifference, to properly train, supervise, and discipline officers and detectives who engaged in unconstitutional conduct.

99.    The DAO caused the violations of Mr. Slaughter's due process rights to a fair trial and to disclosure of *Brady* evidence by virtue of a long-standing practice and custom of suppressing exculpatory and impeaching evidence; failing as a matter of policy, practice and custom, to properly train, supervise and discipline assistant prosecutors as to their duties under *Brady*; by the actions of the final policymaker for the DAO, Lynne Abraham, in not disclosing *Brady* material to counsel for Slaughter on the ground that it was not reliable; and permitting prosecutor Vega to engage in the same misconduct.

100.    The unlawful conduct outlined above caused Mr. Slaughter to be improperly arrested, prosecuted, and imprisoned for more than 18 years for a crime he did not commit.

101.    As a direct and proximate result of defendants' actions and omissions, Mr.
Slaughter sustained loss of his freedom, loss of productive years of his adult life, pain and
suffering, mental anguish, emotional distress, indignities, loss of natural psychological
development, and restrictions on personal freedoms and autonomy, including educational,
vocational, and athletic opportunities, sexual relationships, family relations, travel, and freedom
of speech and expression.

102.    As a direct and proximate result of the defendants' actions and omissions, Mr.
Slaughter sustained economic injuries and damages, including loss of income and loss of career
opportunities.

103.    As a direct and proximate result of defendants' actions and omissions, Mr.
Slaughter sustained and continues to suffer physical injuries and damages, including physical
pain and suffering, personal injuries, physical illness, and inadequate medical care.

104.    As a direct and proximate result of defendants' actions and omissions, Mr.
Slaughter sustained mental health injuries and damages, including adverse psychological
symptoms, mental anguish, and emotional distress, which he continues to experience, and which
will continue in the future.

**V.    Causes of Action**

### Count 1

**Plaintiff v. Individual Detective Defendants**
**Section 1983—Violation of the Due Process Clause of the Fourteenth Amendment:**
**Coercion and Fabrication of Evidence**

105.    The individual defendants, acting individually and in concert, and within the
scope of their employment with the PPD, deprived Plaintiff Mumin Slaughter of his clearly
established right to due process of law and a fair trial by fabricating inculpatory evidence and
deliberately using coercion and/or suggestion to obtain inculpatory statements, including

threatening witnesses to provide false statements inculpating Mr. Slaughter. The fabrication of

this evidence violated Mr. Slaughter's right to a fair trial and due process of law under the

Fourteenth Amendment to the U.S. Constitution. The individual defendants performed these acts

under color of state law, intentionally, with reckless disregard for the truth, and with deliberate

indifference to Slaughter's clearly established constitutional rights. No reasonable officer would

have believed this conduct was lawful. Defendants' acts and omissions in this regard were the

direct and proximate cause of Slaughter's wrongful conviction and related injuries. Defendants

knew, or should have known, that their conduct would result in Slaughter's wrongful arrest,

prosecution, conviction, and incarceration.

## Count 2

### Plaintiff v. Individual Detective Defendants
### Section 1983—Violation of the Fourth and Fourteenth Amendments: Malicious Prosecution

106.    The individual defendants, acting individually and in concert caused the initiation

of a prosecution against Mr. Slaughter without probable cause and with malice, thereby

subjecting Mr. Slaughter to a malicious prosecution in violation of the Fourth and Fourteenth

Amendments to the U.S. Constitution, and that prosecution was terminated favorably to Mr.

Slaughter. The individual defendants performed these acts under color of state law intentionally,

with reckless disregard for the truth, and with deliberate indifference to Velazquez's clearly

established constitutional rights. No reasonable officer would have believed this conduct was

lawful. The individual defendants' acts and omissions in this regard were the direct and

proximate cause of Velazquez's injuries.

## Count 3

### Plaintiff v. Individual Detective Defendants
### Section 1983— Violation of the Fourteenth Amendment: Suppression of Exculpatory
### and/or Impeachment Evidence

107.    The individual defendants, acting individually and in concert, and within the scope of their employment with the PPD, deprived Plaintiff Mumin Slaughter of his clearly established right to due process of law and a fair trial by withholding and/or suppressing exculpatory and impeaching evidence from the defense. The suppression of this evidence violated Mr. Slaughter's right to a fair trial and due process of law under the Fourteenth Amendment to the U.S. Constitution. The individual defendants performed these acts under color of state law, intentionally, with reckless disregard for the truth, and with deliberate indifference to Slaughter's clearly established constitutional rights. No reasonable officer would have believed this conduct was lawful. Defendants' acts and omissions in this regard were the direct and proximate cause of Slaughter's wrongful conviction and related injuries. Defendants knew, or should have known, that their conduct would result in Slaughter's wrongful arrest, prosecution, conviction, and incarceration.

**Count 4**

**Plaintiff v. Individual Detective Defendants**
**Section 1983—Violation of the Fourth and Fourteenth Amendments:**
**Civil Rights Conspiracy**

108.    The individual detective defendants, acting within the scope of their employment and under color of state law, agreed among themselves and with other individuals to act in concert in order to deprive Plaintiff Mumin Slaughter of his clearly established Fourth and Fourteenth Amendment rights to be free from unreasonable searches and seizures, false arrest, false imprisonment, malicious prosecution, deprivation of liberty without due process of law, and to a fair trial. Defendants' acts and omissions in this regard were the direct and proximate cause of Slaughter's injuries. Defendants knew, or should have known, that their conduct would result in Slaughter's wrongful arrest, charging, prosecution, conviction, and incarceration.

**Count 5**

**Plaintiff v. Defendant City of Philadelphia
Section 1983—Municipal Liability**

109.    Defendant City of Philadelphia, with deliberate indifference, adopted and acquiesced in policies, practices, and customs which were a moving force in the violation of Mr. Slaughter's constitutional rights by the defendant detectives, including policies, practices, and customs of a failure to properly train, supervise, and discipline officers.

**Count 6**

**Plaintiff v. Defendant Philadelphia District Attorney's Office
Section 1983—Governmental Liability for Violations of Fourteenth Amendment by Failing
to Disclose Exculpatory and Impeachment Evidence**

110.    Defendant DAO, acting with deliberate indifference and by the actions of final policymaker District Attorney Lynne Abraham, caused the violation of Mr. Slaughter's rights to due process of law by failing, as a matter of policy, practice, and custom, to properly train, supervise, and discipline prosecutors with respect to their constitutional obligations to disclose all material impeaching and exculpatory evidence; by adopting a policy, practice, and custom of non-compliance with prosecutors' constitutional obligations to disclose all material impeaching and exculpatory evidence, including where prosecutors claimed a subjective belief that the evidence was not reliable; and through the actions of final policymaker District Attorney Lynne Abraham in not complying with her obligation to disclose all material impeaching and exculpatory evidence in Mr. Slaughter's case; all in violation of the Fourteenth Amendment.

**Count 7**

**Plaintiff v. Individual Detective Defendants**
**Supplemental State Claim—Malicious Prosecution**

111.    The individual defendants, acting alone, jointly, and/or in concert and conspiracy, knowingly, intentionally, negligently, maliciously, and/or recklessly caused the malicious prosecution of Mr. Slaughter without probable cause, in violation of the laws of the Commonwealth of Pennsylvania. The proceedings ultimately terminated in Slaughter's favor. As a result of this malicious prosecution, Mr. Slaughter sustained the injuries set forth above.

**Count 8**

**Plaintiff v. Individual Detective Defendants**
**Supplemental State Claim—Conspiracy**

112.    The individual defendants acted in concert with the common purpose to cause the malicious prosecution of Plaintiff Mumin Slaughter in violation of the laws of the Commonwealth of Pennsylvania. The individual defendants did in fact cause the malicious prosecution of Mr. Slaughter without probable cause, including by fabricating evidence and suppressing exculpatory and impeachment evidence. The proceedings ultimately terminated in Mr. Slaughter's favor. As a result of this conspiracy, Mr. Slaughter sustained the injuries set forth above.

**WHEREFORE**, plaintiff Mumin Slaughter respectfully requests:

A.    Compensatory damages as to all defendants;

B.    Punitive damages as to the individual defendants;

C.    Reasonable attorneys' fees and costs;

D.    Such other and further relief as may appear just and appropriate.

Plaintiff hereby demands a jury trial.

44

/s/ Christina Matthias
Christina Matthias
Jon Cioschi
Alan Tauber
WISEMAN SCHWARTZ CIOSCHI & TRAMA
718 Arch Street, Suite 701 North
Philadelphia, PA 19106
(215) 360-3988
matthias@wisemanschwartz.com

Counsel for Plaintiff
Mumin Slaughter

December 15, 2025